IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

CHRISTINE M. BAILEY,

    Plaintiff,

vs.

MICHAEL J. ASTRUE,
Commissioner of Social Security,

    Defendant.

No. C11-0005

RULING ON JUDICIAL REVIEW

## TABLE OF CONTENTS

*I.*    *INTRODUCTION* ........................................ 2

*II.*   *PROCEDURAL BACKGROUND* .......................... 2

*III.*  *PRINCIPLES OF REVIEW* ............................... 3

*IV.*  *FACTS* .............................................. 5
    *A.*    *Bailey's Education and Employment Background* ............. 5
    *B.*    *Administrative Hearing Testimony* ..................... 5
        *1.*    *Bailey's Testimony* ......................... 5
        *2.*    *Vocational Expert Testimony* ................... 6
    *C.*    *Bailey's Medical History* ............................ 7

*V.*   *CONCLUSIONS OF LAW* ............................... 11
    *A.*    *ALJ's Disability Determination* ..................... 11
    *B.*    *Objections Raised By Claimant* ..................... 13
        *1.*    *Dr. Peterson's Opinions* ..................... 13
        *2.*    *Credibility Determination* ................... 18
    *C.*    *Reversal or Remand* ............................ 22

*VI.*  *CONCLUSION* ...................................... 23

*VII.* *ORDER* ............................................ 23

# I. INTRODUCTION

This matter comes before the Court on the Complaint (docket number 3) filed by Plaintiff Christine M. Bailey on January 11, 2011, requesting judicial review of the Social Security Commissioner's decision to deny her application for Title II disability insurance benefits. Bailey asks the Court to reverse the decision of the Social Security Commissioner ("Commissioner") and order the Commissioner to provide her disability insurance benefits. In the alternative, Bailey requests the Court to remand this matter for further proceedings.

# II. PROCEDURAL BACKGROUND

On July 18, 2007, Bailey applied for disability insurance benefits. In her application, Bailey alleged an inability to work since February 19, 2007 due to narcolepsy, sleep apnea, insomnia, and impaired concentration. Bailey's application was denied on September 17, 2007. On November 8, 2007, her application was denied on reconsideration. On December 17, 2007, Bailey requested an administrative hearing before an Administrative Law Judge ("ALJ"). On June 25, 2009, Bailey appeared via video conference with her attorney before ALJ Denzel R. Busick for an administrative hearing. Bailey and vocational expert Elizabeth M. Albrecht testified at the hearing. In a decision dated August 17, 2009, the ALJ denied Bailey's claim. The ALJ determined that Bailey was not disabled and not entitled to disability insurance benefits because she was functionally capable of performing her past relevant work as an appliance inspector and appliance assembler. Bailey appealed the ALJ's decision. On November 8, 2010, the Appeals Council denied Bailey's request for review. Consequently, the ALJ's August 17, 2009 decision was adopted as the Commissioner's final decision.

On January 11, 2011, Bailey filed this action for judicial review. The Commissioner filed an answer on May 23, 2011. On June 23, 2011, Bailey filed a brief arguing that there is not substantial evidence in the record to support the ALJ's finding that she was not disabled and could perform her past relevant work as an appliance inspector

2

and appliance assembler. On August 19, 2011, the Commissioner filed a responsive brief arguing the ALJ's decision was correct and asking the Court to affirm the ALJ's decision. On August 30, 2011, Bailey filed a reply brief. On April 4, 2011, both parties consented to proceed before a magistrate judge in this matter pursuant to the provisions set forth in 28 U.S.C. § 636(c).

## III. PRINCIPLES OF REVIEW

Title 42, United States Code, Section 405(g) provides that the Commissioner's final determination following an administrative hearing not to award disability insurance benefits is subject to judicial review. 42 U.S.C. § 405(g). 42 U.S.C. § 405(g) provides the Court with the power to: "[E]nter . . . a judgment affirming, modifying, or reversing the decision of the Commissioner . . . with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . ." *Id.*

The Court will "affirm the ALJ's decision if it is supported by substantial evidence on the record as a whole." *Gates v. Astrue*, 627 F.3d 1080, 1082 (8th Cir. 2010) (citation omitted). Evidence is "substantial evidence" if a reasonable person would find it adequate to support the ALJ's determination. *Id.* (citing *Guilliams v. Barnhart*, 393 F.3d 798, 801 (8th Cir. 2005)); *see also Wildman v. Astrue*, 596 F.3d 959, 963-64 (8th Cir. 2010) ("'Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion.' *McKinney v. Apfel*, 228 F.3d 860, 863 (8th Cir. 2000).").

In determining whether the ALJ's decision meets this standard, the Court considers "all of the evidence that was before the ALJ, but it [does] not re-weigh the evidence." *Vester v. Barnhart*, 416 F.3d 886, 889 (8th Cir. 2005) (citation omitted). The Court not only considers the evidence which supports the ALJ's decision, but also the evidence that detracts from his or her decision. *Moore v. Astrue*, 623 F.3d 599, 602 (8th Cir. 2010); *see also Cox v. Astrue*, 495 F.3d 614, 617 (8th Cir. 2007) (Review of an ALJ's decision

"extends beyond examining the record to find substantial evidence in support of the ALJ's decision; [the court must also] consider evidence in the record that fairly detracts from that decision."). In *Culbertson v. Shalala*, 30 F.3d 934, 939 (8th Cir. 1994), the Eighth Circuit Court of Appeals explained this standard as follows:

> This standard is 'something less than the weight of the evidence and it allows for the possibility of drawing two inconsistent conclusions, thus it embodies a zone of choice within which the [Commissioner] may decide to grant or deny benefits without being subject to reversal on appeal.'

*Id.* (quoting *Turley v. Sullivan*, 939 F.2d 524, 528 (8th Cir. 1991), in turn quoting *Bland v. Bowen*, 861 F.2d 533, 535 (8th Cir. 1988)). In *Casey v. Astrue*, 503 F.3d 687 (8th Cir. 2007), the Eighth Circuit further explained that a court "will not disturb the denial of benefits so long as the ALJ's decision falls within the available 'zone of choice.'" *Id.* at 691 (citations omitted). "A decision is not outside that 'zone of choice' simply because [a court] may have reached a different conclusion had [the court] been the fact finder in the first instance." *Hacker v. Barnhart*, 459 F.3d 934, 936 (8th Cir. 2006). Therefore, "even if inconsistent conclusions may be drawn from the evidence, the agency's decision will be upheld if it is supported by substantial evidence on the record as a whole." *Guilliams*, 393 F.3d at 801 (citing *Chamberlain v. Shalala*, 47 F.3d 1489, 1493 (8th Cir. 1995)); *see also Wildman*, 596 F.3d at 964 ("If substantial evidence supports the ALJ's decision, we will not reverse the decision merely because substantial evidence would have also supported a contrary outcome, or because we would have decided differently."); *Moore v. Astrue*, 572 F.3d 520, 522 (8th Cir. 2009) ("'If there is substantial evidence to support the Commissioner's conclusion, we may not reverse even though there may also be substantial evidence to support the opposite conclusion.' *Clay v. Barnhart*, 417 F.3d 922, 928 (8th Cir. 2005).").

## IV. FACTS

### A. Bailey's Education and Employment Background

Bailey was born in 1972. She is a high school graduate. She also attended two years of college, and studied accounting and business. At the administrative hearing, Bailey indicated that she is able to perform basic math skills and read, write, speak, and understand the English language.

The record contains a detailed earnings report for Bailey. The report covers Bailey's employment history from 1985 to 2008. From 1989 to 1992, she earned between $1,211.05 (1989) and $10,146.45 (1992). From 1993 to 2007, Bailey earned between $15,452.31 (1994) and $33,970.90 (2006). She earned $12.69 in 2008.

### B. Administrative Hearing Testimony

#### 1. Bailey's Testimony

At the administrative hearing, the ALJ asked Bailey to explain why she believed she was unable to perform any type of full-time work. Baily answered that she has difficulty sleeping at night, and as a result, during the day she falls asleep a lot or feels the need to take a nap and rejuvenate her mind and body. She also stated that "[a] lot of the times, I feel like my concentration level and my attention span is not good because of the lack of sleep."[1] Bailey was diagnosed with narcolepsy in 2007. She indicated that she sees a sleep therapist and takes medication to help with her sleep problems.

Bailey's attorney also questioned Bailey, and asked Bailey to describe her typical day. Bailey testified that she gets up in the morning to get her daughter off to school, and then lies down around 8:00 a.m. to rest and help her get through the day. Specifically, she stated that "I usually rest until about noon or one, and then I only feel like I'm halfway at an activity point from like two in the afternoon until about ten at night, [which] is my

---

[1] *See* Administrative Record at 38.

productive time."[2] Bailey's attorney inquired whether her sleep problems interfered with taking care of her daughter and managing her household. Bailey testified that:

> Emotionally, going from being able to get [up] at 4:30 every morning and work full-time and take care of my daughter and my house and everything, to not having the energy to do that, has just emotionally been stressful for me. I feel like I'm letting myself down because I just physically can't do it.

(Administrative Record at 45.)

### 2. *Vocational Expert Testimony*

At the hearing, the ALJ provided vocational expert Elizabeth Albrecht with a hypothetical for an individual who is:

> able to work at the medium level, pick up 50 pounds occasionally, 25 pounds frequently. Assume they should be able to sit six hours out of an eight-hour workday. Stand and walk combined, six hours. Unlimited ability to use hand controls. No limits on climbing stairs or ladders. No postural limits. No manipulation limits. No visual limits with glasses, no communication limits. However, they would be advised to avoid any concentrated exposure to hazards such as unprotected heights, faster, very dangerous machinery. They would also likely have . . . moderate limits on their activities of daily living. Mild limits on their social functioning, and moderate limits on their concentration, persistence, and pace. They would likely have some moderate limits in the ability to carry out details, moderate limits in the ability to maintain extended concentration.

(Administrative Record at 49-50.) The vocational expert testified that under such limitations, Bailey could perform her past relevant work as an appliance inspector and appliance assembler. Next, the ALJ asked the vocational expert whether her opinion would be affected by the following:

> what if the concentration problems were problematic, such they might reach marked levels of limitation? On an intermittent, unexpected basis -- you can't confine it to any

---

[2] *Id.* at 44.

> particular period of the eight-hour work period, but likely
> could affect their pace, their focus, their attention to detail, to
> an extent that they would be affected maybe 25 percent of the
> time.

(Administrative Record at 50.) The vocational expert testified that under such a limitations, Bailey would be precluded from full-time competitive employment. The ALJ also asked whether missing three to four days of work per month due to concentration and fatigue problems would preclude full-time employment. Again, the vocational expert replied that such a limitation would preclude full-time employment. Lastly, Bailey's attorney asked the vocational expert whether needing three to four unscheduled breaks per day would be permissible to most employers. The vocational expert stated that such a limitation would also preclude full-time employment.

## C. Bailey's Medical History

On June 18, 2007, Bailey was referred to Dr. Andrew C. Peterson, M.D., for an evaluation of "peculiar" sleep problems. Dr. Peterson outlined Bailey's sleep problems as follows:

> Her major complaints are that some days she can't fall asleep.
> If she does fall asleep, she has vivid dreams and nightmares
> that wake her up. She feels scared and can't get back to sleep.
> She is excessively sleepy during the day, and she feels spacey
> and groggy and can't concentrate.

(Administrative Record at 261.) Dr. Peterson noted that Bailey started having sleep problems in November 2006, including nightmares. Dr. Peterson indicated that by February 2007, Bailey's nightmares were frequent and caused her sleep to be fragmented. As a result of her sleep problems, Bailey was taken off of work and placed on short-term disability. Upon examination, Dr. Peterson opined that Bailey's symptoms were "very suggestive of narcolepsy without cataplexy . . . I suspect she has OSA [(Obstructive Sleep Apnea)], worse in REM, and that REM deprivation is the cause of this problem[.]"[3]

---

[3] *See* Administrative Record at 259.

Dr. Peterson diagnosed Bailey with obstructive sleep apnea, narcolepsy, excessive daytime sleepiness, depression, and restless leg syndrome. Dr. Peterson recommended medication and further evaluation as treatment.

On June 19, 2007, Bailey underwent a polysomnographic recording of her nocturnal sleep. The recording of her nocturnal sleep showed a dozen obstructive events, with over half captured during periods of REM sleep. On June 20, she underwent a daytime multiple sleep latency test. The results of the test were abnormal. Dr. Scott Geisler, M.D., the doctor administering the test, opined that Bailey's sleep studies were "consistent with narcolepsy and profound excessive daytime sleepiness."[4]

On July 10, 2007, Bailey had a follow-up appointment with Dr. Peterson. During the appointment, Dr. Peterson explained the results of her sleep tests, and diagnosed Bailey with narcolepsy, fragmentation of sleep with nightmares, likely caused by narcolepsy, and obstructive sleep apnea during REM sleep while in a supine position. Dr. Peterson recommended medication as treatment.

On August 9, 2007, Bailey returned to Dr. Peterson for further treatment. Dr. Peterson found that Bailey's sleep problems were mostly unchanged since July. Dr. Peterson recommended continued use of medication as treatment. Dr. Peterson also determined that Baily should remain off work. Specifically, Dr. Peterson ordered that Bailey not "work on the line, and right now she would need to be able to take naps as needed."[5]

On August 27, 2007, Dr. John Garfield, Ph.D., reviewed Bailey's medical records and provided Disability Determination Services ("DDS") with a Psychiatric Review Technique and mental residual functional capacity ("RFC") assessment for Bailey. On the Psychiatric Review Technique assessment, Dr. Garfield diagnosed Bailey with depression. Dr. Garfield determined that Bailey had the following limitations: moderate restriction of

---

[4] *Id.* at 267.

[5] *See* Administrative Record at 290.

activities of daily living, mild difficulties in maintaining social functioning, and marked difficulties in maintaining concentration, persistence, or pace. On the mental RFC assessment, Dr. Garfield found no moderate or marked limitations for Bailey, and determined that she was not significantly limited in any of the following areas: understanding and memory, sustained concentration and persistence, social interaction, and adaptation. Dr. Garfield concluded that:

> [D]iagnosis of depression has also been confirmed by Neurologist, Dr. Andrew Peterson, who at his most recent visit with [Bailey] expresses hope that they can have her back to work by January. It will be concluded that while she currently has a severe mental impairment, by 2/19/200[8] she should be capable of functioning on an unrestricted basis.

(Administrative Record at 317.)

On September 11, 2007, Dr. Rene Staudacher, D.O., reviewed Bailey's medical records and provided DDS with a physical RFC assessment for Bailey. Dr. Staudacher found no exertional, postural, manipulative, visual, or communicative limitations. Dr. Staudacher determined that Bailey should avoid concentrated exposure to hazards, such as machinery and heights. Dr. Staudacher concluded that:

> Review of [activities of daily living] reveals that [Bailey] does household and yard chores and cares for her daughter, but needs to nap during the day. However, it is anticipated that once [her] meds are optimally adjusted, she will be able to sustain an 8 hour work day. She should still avoid hazards as outlined due to her narcolepsy.

(Administrative Record at 325.)

On December 18, 2007, at the request of Bailey's attorney, Dr. Peterson filled out an RFC questionnaire dealing with narcolepsy. In the questionnaire, Dr. Peterson diagnosed Bailey with narcolepsy and insomnia. Dr. Peterson indicated that Bailey has 21 narcoleptic episodes per week. Episodes last 10 to 20 minutes. Dr. Peterson opined that Bailey's episodes of narcolepsy would "likely" disrupt the work of her co-workers and require more supervision at work than an unimpaired worker. Dr. Peterson restricted

Bailey from working at heights or with power machinery. Dr. Peterson opined that Bailey could not work a normal eight-hour workday. Instead, Dr. Peterson stated that Bailey could only work 2 to 4 hours per day. Dr. Peterson also found that Bailey would need to lie down at unpredictable intervals three times per day during an eight-hour work shift. Dr. Peterson further opined that Bailey would likely miss 3 or more days of work per month due to her difficulties with narcolepsy.

In a letter dated September 23, 2008, Dr. Peterson outlined Bailey's functional limitations. Dr. Peterson indicated that Bailey was under his care for numerous sleep disorders, including narcolepsy, obstructive sleep apnea, and restless leg syndrome. Dr. Peterson explained that "[n]arcolepsy causes profound daytime sleepiness, and may precipitate acute sleep attacks that are irresistible at random times across the day."[6] Dr. Peterson provided the following restrictions for Bailey:

> Ms. Bailey is released to work for four hours per day, five days a week. At this point in time, her work place needs to know that she may fall asleep unexpectedly, and may require a spot to lie down and nap for 15 minutes within a four hour interval. There are no limitations on lifting, standing, or carrying. She is not cleared for working heavy machinery where loss of consciousness could cause injury to herself or others.

(Administrative Record at 363.)

On May 20, 2009, Bailey was referred to Dr. Paul Eggerman, Ph.D., for sleep related concerns and possible anxiety disorder. In discussing her sleep difficulties, Bailey reported that:

> her best energy occurs from the hours of 2 pm until 10 pm. She reported that during the morning and after 10 pm she feels out of it and foggy. She states that she generally feels unrested. She reports that she stays exhausted when she wakes up in the morning. . . . She reports unless she has an appointment or responsibility to be done she spends most of

---

[6] *See* Administrative Record at 363.

her spare time trying to sleep. She reports that she has very vivid dreams and often nightmares.

(Administrative Record at 422.) Upon examination, Dr. Eggerman diagnosed Bailey with adjustment disorder, psychological insomnia (diagnosed by Dr. Peterson), history of panic disorder, and narcolepsy (diagnosed by Dr. Peterson). Dr. Eggerman recommended psychotherapy to help improve her sleep hygiene.

On June 17, 2009, Bailey met with Dr. Eggerman for a follow-up appointment. Dr. Eggerman and Bailey discussed her eating and drinking habits, including her drinking soda and tea in the hour before she goes to bed. Dr. Eggerman asked Bailey to keep a sleep diary, so that they could "make any changes that may be necessary to promote healthier sleeping patterns and improvement in her energy."[7] Upon examination, Dr. Eggerman again diagnosed Bailey with psychological insomnia and narcolepsy. Dr. Eggerman concluded that:

> [Bailey] appears to be interested in improving her sleep hygiene and having better energy throughout the day. She is interested in utilizing the psychotherapy situation to help her develop the skills to develop positive choices for improved sleep hygiene. Her response to the interventions in today's session were positive. She does appear motivated to be an active participant in treatment at this time.

(Administrative Record at 420.)

## V. CONCLUSIONS OF LAW

### A. ALJ's Disability Determination

The ALJ determined that Bailey is not disabled. In making this determination, the ALJ was required to complete the five-step sequential test provided in the social security regulations. *See* 20 C.F.R. § 404.1520(a)-(g); *Bowen v. Yuckert*, 482 U.S. 137, 140-42 (1987); *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010); *Kluesner v. Astrue*, 607 F.3d 533, 536 (8th Cir. 2010). The five steps an ALJ must consider are:

---

[7] *See* Administrative Record at 420.

> (1) whether the claimant is currently engaged in any substantial gainful activity; (2) whether the claimant has a severe impairment; (3) whether the impairment meets or equals an impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Appendix"); (4) whether the claimant can return to [his or] her past relevant work; and (5) whether the claimant can adjust to other work in the national economy.

*Moore*, 572 F.3d at 523 (citing 20 C.F.R. § 404.1520(a)(4)(i)-(v)). "If a claimant fails to meet the criteria at any step in the evaluation of disability, the process ends and the claimant is determined to be not disabled." *Pelkey v. Barnhart*, 433 F.3d 575, 577 (8th Cir. 2006) (citing *Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005), in turn quoting *Eichelberger v. Barnhart*, 390 F.3d 584, 590-91 (8th Cir. 2004)).

In order to establish a disability claim, "[t]he claimant bears the burden of demonstrating an inability to return to [his or] her past relevant work." *Pate-Fires v. Astrue*, 564 F.3d 935, 942 (8th Cir. 2009) (citing *Steed v. Astrue*, 524 F.3d 872, 875 n.3 (8th Cir. 2008)). If the claimant meets this burden, the burden of proof then shifts to the Commissioner to "show [that] the claimant is capable of performing other work." *Id.* In order to show that a claimant is capable of performing other work, the Commissioner must demonstrate that the claimant retains the residual functional capacity ("RFC") to perform a significant number of other jobs in the national economy that are consistent with claimant's impairments and vocational factors such as age, education, and work experience. *Beckley v. Apfel*, 152 F.3d 1056, 1059 (8th Cir. 1998) (citing *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993)). The RFC is the most an individual can do despite the combined effect of all of his or her credible limitations. 20 C.F.R. § 404.1545. "'It is the ALJ's responsibility to determine [a] claimant's RFC based on all the relevant evidence, including medical records, observations of treating physicians and others, and [the] claimant's own description of her limitations.'" *Jones v. Astrue*, 619 F.3d 963, 971 (8th Cir. 2010) (quoting *Page v. Astrue*, 484 F.3d 1040, 1043 (8th Cir. 2007)); 20 C.F.R. § 404.1545.

The ALJ applied the first step of the analysis and determined that Bailey had not engaged in substantial gainful activity since February 19, 2007. At the second step, the ALJ concluded from the medical evidence that Bailey had the following severe combination of impairments: narcolepsy, obstructive sleep apnea, restless leg syndrome, obesity, major depressive disorder, and adjustment disorder. At the third step, the ALJ found that Bailey did not have an impairment or combination of impairments listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1. At the fourth step, the ALJ determined Bailey's RFC as follows:

> [Bailey] has the residual functional capacity to perform medium work . . . in that [she] is capable of carrying/lifting 50 pounds occasionally and 25 pounds frequently, can sit for six hours of an eight hour day, and can stand/walk for a total of six hours of an eight hour day. [Bailey] should avoid hazards, such as unguarded heights and fast/dangerous machinery; her activities of daily living are moderately restricted, social functioning is mildly limited, and concentration, persistence, and pace would be moderately limited. [Bailey] would have moderate difficulties in carrying out detailed instructions and maintaining extended concentration.

(Administrative Record at 15.) Also at the fourth step, the ALJ determined that Bailey was capable of performing her past relevant work as an appliance inspector and appliance assembler. Therefore, the ALJ concluded that Bailey was not disabled.

### B.  Objections Raised By Claimant

Bailey argues that the ALJ erred in two respects. First, Bailey argues that the ALJ failed to properly consider the opinions of her treating doctor, Dr. Peterson. Second, Bailey argues that the ALJ failed to properly evaluate her subjective allegations of disability.

### 1.    Dr. Peterson's Opinions

Bailey argues that the ALJ failed to properly evaluate the opinions of her treating physician, Dr. Peterson. Specifically, Bailey argues that the ALJ's reasons for discounting Dr. Peterson's opinions are not supported by substantial evidence in the record. Bailey

concludes that if Dr. Peterson's opinions were properly evaluated and weighed by the ALJ, then she would have been found to be disabled.

An ALJ is required to "assess the record as a whole to determine whether treating physicians' opinions are inconsistent with substantial evidence on the record." *Travis v. Astrue*, 477 F.3d 1037, 1041 (8th Cir. 2007) (citing 20 C.F.R. § 404.1527(d)(2)). The opinion of a treating physician:

> should not ordinarily be disregarded and is entitled to substantial weight. A treating physician's opinion regarding an applicant's impairment will be granted controlling weight, provided the opinion is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in the record.

*Singh v. Apfel*, 222 F.3d 448, 452 (8th Cir. 2000) (citations omitted).

"Although a treating physician's opinion is entitled to great weight, it does not automatically control or obviate the need to evaluate the record as a whole." *Hogan v. Apfel*, 239 F.3d 958, 961 (8th Cir. 2001) (citing *Prosch v. Apfel*, 201 F.3d 1010, 1013 (8th Cir. 2000)). "The ALJ may discount or disregard such an opinion if other medical assessments are supported by superior medical evidence, or if the treating physician has offered inconsistent opinions." *Id.*; *see also Travis*, 477 F.3d at 1041 ("A physician's statement that is 'not supported by diagnoses based on objective evidence' will not support a finding of disability. *Edwards v. Barnhart*, 314 F.3d 964, 967 (8th Cir. 2003). If the doctor's opinion is 'inconsistent with or contrary to the medical evidence as a whole, the ALJ can accord it less weight.' *Id.*"); *Strongson v. Barnhart*, 361 F.3d 1066, 1070 (8th Cir. 2004) (an ALJ does not need to give controlling weight to a physician's RFC assessment if it is inconsistent with other substantial evidence in the record); *Cabrnoch v. Bowen*, 881 F.2d 561, 564 (8th Cir. 1989) (the resolution of conflicts of opinion among various treating and examining physicians is the proper function of an ALJ).

The regulations also require an ALJ to give "good reasons" for giving weight to statements provided by a treating physician. *See* 20 C.F.R. § 404.1527(d)(2). The

regulations also require an ALJ to give "good reasons" for rejecting statements provided by a treating physician. *Id.*; *see also Tilley v. Astrue*, 580 F.3d 675, 680 (8th Cir. 2009) ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.") (citation omitted).

In his decision, the ALJ addressed the opinions of Dr. Peterson as follows:

> [Bailey's] treating neurologist, Dr. Andrew Peterson, submitted an opinion concerning [Bailey's] functioning in light of her sleep disorders. The doctor apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Bailey], and seemed to uncritically accept as true most, if not all, of what [Bailey] reported. His conclusions were based on a short treatment history, only six months, and was not updated. Although the doctor stated in his opinion that [Bailey] was significantly limited by narcoleptic attacks in her ability to engage in any work, it is not clear that the doctor was familiar with the definition of 'disability' contained in the Social Security Act and regulations. The doctor issued an opinion concerning vocational issues, which he is not qualified to do; nor is he qualified to evaluate how those vocational issues concern the finding of disability for this claimant under the Social Security Act and regulations. The doctor's opinion is without substantial support from the other evidence of record, including his own longitudinal treatment history of [Bailey] that was routine and conservative management, which obviously renders it less persuasive. The undersigned therefore declines to afford Dr. Peterson's opinion controlling weight.

(Administrative Record at 21.)

In reviewing the ALJ's decision, the Court bears in mind that an ALJ has a duty to develop the record fully and fairly. *Cox v. Astrue*, 495 F.3d 614, 618 (8th Cir. 2007); *Sneed v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004); *Wilcutts v. Apfel*, 143 F.3d 1134, 1137 (8th Cir. 1998). Because an administrative hearing is a non-adversarial proceeding, the ALJ must develop the record fully and fairly in order that "'deserving claimants who apply for benefits receive justice.'" *Wilcutts*, 143 F.3d at 1138 (quoting *Battles v. Shalala*,

36 F.3d 43, 44 (8th Cir. 1994)). Furthermore, if an ALJ rejects the opinions of a treating physician, the regulations require that the ALJ give "good reasons" for rejecting those opinions. *See* 20 C.F.R. § 404.1527(d)(2). The Court finds that the ALJ has failed to meet these requirements. Specifically, the ALJ failed to give "good reasons" for rejecting the opinions of Dr. Peterson, Bailey's treating doctor. *See Tilley*, 580 F.3d at 680 ("The regulations require the ALJ to 'always give good reasons' for the weight afforded to the treating source's opinion.").

First, the ALJ's finding that Dr. Peterson "apparently relied quite heavily on the subjective report of symptoms and limitations provided by [Bailey], and seemed to uncritically accept as true most, if not all, of what [Bailey] reported" is incorrect.[8] While it is true that Dr. Peterson relied on Bailey's subjective reports, he also relied on two sleep studies which he directed Bailey to undergo after first meeting with her. A polysomnographic recording of Bailey's nocturnal sleep showed one dozen obstructive events, with over half captured during periods of REM sleep.[9] The results of a multiple sleep latency test were abnormal.[10] Dr. Scott Geisler, M.D., the doctor administering the test, opined that Bailey's sleep studies were "consistent with narcolepsy and profound excessive daytime sleepiness."[11] Next the ALJ states that Dr. Peterson's "conclusions were based on a short treatment history, only six months, and was not updated."[12] Again, this is incorrect. Dr. Peterson's opinions from December 2007 are consistent with opinions Dr. Peterson expressed in September 2008, including Bailey's restriction of

---

[8] *See* Administrative Record at 21.

[9] *See* Administrative Record at 268-271.

[10] *Id.* at 266-67.

[11] *Id.* at 267.

[12] *Id.* at 21.

working no more than 4 hours in a regular workday.[13] Thus, Dr. Peterson's opinions were updated.[14] The ALJ's assertion that Dr. Peterson's opinion that Bailey is "significantly limited by narcoleptic attacks in her ability to engage in any work," and is an opinion outside the realm of Dr. Peterson's expertise is factually wrong. Dr. Peterson never opined that Bailey was incapable of work due to her problem with narcolepsy; instead, Dr. Peterson *restricted* Bailey from working more than 4 hours in a single day.[15] Lastly, the ALJ's finding that Dr. Peterson's "opinion is without substantial support from the other evidence of record, including his own longitudinal treatment history of [Bailey] that was routine and conservative management, which obviously renders it less persuasive" is disingenuous and incorrect.[16] The ALJ points to no other evidence in the record which is inconsistent or disputes the opinions of Dr. Peterson. Moreover, the ALJ's claim that Dr. Peterson's "routine" and "conservative" treatment makes his opinions "less persuasive" is nothing more than mere speculation. The ALJ offers no evidence suggesting that there is some type of less conservative treatment, let alone any other type of treatment that should have been administered for Bailey's sleep disorders. The ALJ also fails to support his decision with any opinion evidence from a doctor or medical professional which supports his suggestion that there is some less conservative or more aggressive treatment that would alleviate Bailey's sleep disorders. The Court believes that as a neurologist that specializes in sleep disorders, Dr. Peterson's opinions should be granted "controlling weight" because his "opinion[s are] well-supported by medically

---

[13] *Compare* Administrative Record at 353-356 (2007 questionnaire) with Administrative Record at 363 (2008 letter).

[14] Interestingly, in his brief, the Commissioner concedes that Dr. Peterson "updated" his opinion in 2008. *See* Commissioner's Brief (docket number 11) at 20 ("Defendant concedes that Dr. Peterson submitted a second opinion in September 2008.").

[15] *See* Administrative Record at 21, 355, 363.

[16] *See* Administrative Record at 21.

acceptable clinical and laboratory diagnostic techniques and [are] not inconsistent with the other substantial evidence in the record." *Singh*, 222 F.3d at 452.

Significantly, the Commissioner concedes that "this case is a close call," but states that substantial evidence supports the ALJ's decision. The Court disagrees with the Commissioner's assertion. The Court finds that the ALJ's decision with regard to Dr. Peterson's opinions is not supported by substantial evidence, and questions whether any evidence, let alone substantial evidence supports the ALJ's rationale with regard to the opinions of Dr. Peterson. Accordingly, the Court finds that Dr. Peterson's opinions should have been given "controlling weight," as his opinions are not inconsistent with substantial evidence in the record as a whole, and are supported by medically acceptable clinical and laboratory diagnostic techniques. *See Singh*, 222 F.3d at 452.

### 2. *Credibility Determination*

Bailey argues that the ALJ failed to properly evaluate her subjective allegations of disability. Bailey maintains that the ALJ's credibility determination is not supported by substantial evidence. The Commissioner argues that the ALJ properly considered Bailey's testimony, and properly evaluated the credibility of her subjective complaints.

When assessing a claimant's credibility, "[t]he [ALJ] must give full consideration to all the evidence presented relating to subjective complaints, including the claimant's prior work record, and observations by third parties and treating and examining physicians relating to such matters as: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medication; [and] (5) functional restrictions." *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984). The absence of objective medical evidence to support a claimant's subjective complaints is also a relevant factor for an ALJ to consider. *Gowell v. Apfel*, 242 F.3d 793, 796 (8th Cir. 2001) (citation omitted). The ALJ, however, may not disregard a claimant's subjective complaints "solely because the objective medical evidence does not fully support them." *Polaski*, 739 F.2d at 1322; *see*

*also Dukes v. Barnhart*, 436 F.3d 923, 928 (8th Cir. 2006) ("In discrediting subjective claims, the ALJ cannot simply invoke *Polaski* or discredit the claim because they are not fully supported by medical evidence.").

Instead, "'[a]n ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.'" *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008) (quoting *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997)); *see also Lowe v. Apfel*, 226 F.3d 969, 972 (8th Cir. 2000) ("The ALJ may not discount a claimant's complaints solely because they are not fully supported by the objective medical evidence, but the complaints may be discounted based on inconsistencies in the record as a whole."). If an ALJ discounts a claimant's subjective complaints, he or she is required to "'detail the reasons for discrediting the testimony and set forth the inconsistencies found.'" *Ford v. Astrue*, 518 F.3d 979, 982 (8th Cir. 2008) (quoting *Lewis v. Barnhart*, 353 F.3d 642, 647 (8th Cir. 2003)); *see also Baker v. Apfel*, 159 F.3d 1140, 1144 (8th Cir. 1998) ("When rejecting a claimant's complaints of pain, the ALJ must make an express credibility determination, must detail reasons for discrediting the testimony, must set forth inconsistencies, and must discuss the *Polaski* factors."). Where an ALJ seriously considers, but for good reason explicitly discredits a claimant's subjective complaints, the Court will not disturb the ALJ's credibility determination. *Johnson v. Apfel*, 240 F.3d 1145, 1148 (8th Cir. 2001) (citing *Pena v. Chater*, 76 F.3d 906, 908 (8th Cir. 1996)); *see also Guilliams*, 393 F.3d at 801 (explaining that deference to an ALJ's credibility determination is warranted if the determination is supported by good reasons and substantial evidence); *Gregg v. Barnhart*, 354 F.3d 710, 714 (8th Cir. 2003) ("If an ALJ explicitly discredits the claimant's testimony and gives good reasons for doing so, we will normally defer to the ALJ's credibility determination."). "'The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts.'" *Wagner*, 499 F.3d at 851 (quoting *Pearsall*, 274 F.3d at 1218).

In his decision, the ALJ determined that:

At one point or another in the record, [Bailey] has reported a myriad of daily activities consistent with the residual functional capacity detailed above. [Bailey] acknowledged the ability to perform household and yard chores, shops, and cares for her daughter, but needs a nap during the day. She reads, talks to her mother on the phone, or watches television for her past times and goes to church three times per week. [Bailey] alleged that her sleep difficulties affect her focus and concentration, also making her easily irritable with others. Although [Bailey's] reports of symptoms and functioning have been consistent over the course of the relevant period, the record suggests some other non-medical factors may have been affecting her functioning adversely. While [Bailey] has had some varying success with medication, the record reveals that she has had significant non-permanent life stressors during the relevant period. The medical evidence of record likewise indicated that [Bailey] seems to ingest a fair amount of caffeinated beverages over the course of a day, possibly contributing to her insomnia issues.

The record reveals that [Bailey] failed to follow-up on recommendations made by Dr. Peterson concerning psychological causes for her sleep issues, which suggests that the symptoms may not have been as serious as has been alleged in connection with this application and appeal. [Bailey] has admitted certain abilities, particularly at her best times of functioning during the day, which provide support for part of the residual functional capacity conclusion in this decision. As mentioned earlier, the record reflects work activity after the alleged onset date. Although that work activity did not constitute disqualifying substantial gainful activity, it does indicate that [Bailey's] daily activities have, at least at times, been somewhat greater than [Bailey] has generally reported. [Bailey] is apparently able to care for young children as part time work, which can be quite demanding both emotionally and in terms of attention/focus.

(Administrative Record at 20.)

In his decision, the ALJ properly set forth the law for making credibility determinations under *Polaski* and the Social Security Regulations. The ALJ also provided

detailed reasons for discrediting Bailey's testimony. The problem with the ALJ's credibility determination is that the ALJ's detailed reasons for discrediting Bailey are not supported by substantial evidence on the record as a whole. *See Finch*, 547 F.3d at 935 ("'An ALJ may discount a claimant's subjective complaints only if there are inconsistencies in the record as a whole.' *Porch v. Chater*, 115 F.3d 567, 572 (8th Cir. 1997).").

Here, as discussed in Section *V.B.1*, the objective medical evidence supports Bailey's subjective allegations. Bailey has been diagnosed with narcolepsy. Dr. Peterson, her treating doctor, has restricted Bailey from working more than 4 hours in a regular workday. Dr. Peterson has placed this restriction on Bailey because she needs daily naps and has narcoleptic episodes at random times, lasting 10-20 minutes per episode. She has approximately three episodes per day.[17] Therefore, even though her physical abilities are generally not limited, and she has the ability to perform various common activities of daily living, her diagnosis of narcolepsy limits her ability to work a full-time job. Significantly, Dr. Peterson's restrictions are consistent with Bailey working part-time, three hours per day at a Girls and Boys club. Accordingly, the Court finds the ALJ's suggestion that Bailey's work activity indicates that her "daily activities have, at least at times, been somewhat greater than [she] has generally reported" is without merit.[18]

Similarly, the Court finds that the ALJ's discussion of Bailey's use of caffeinated beverages is irrelevant. The ALJ points to no evidence in the record which suggests that Bailey's use of caffeinated beverages is the primary reason, or even a reason at all that she suffers from multiple sleep disorders. Lastly, the ALJ's finding that Bailey failed "to follow-up on recommendations made by Dr. Peterson concerning psychological causes for

---

[17] *See* Administrative Record at 353-356; 363.

[18] *Id.* at 20.

her sleep issues" is incorrect.[19] In May 2009, Bailey met with Dr. Eggerman, a psychologist, for help with her sleep disorders.[20] At a follow-up appointment in June 2009, Dr. Eggerman noted that:

> [Bailey] appears to be interested in improving her sleep hygiene and having better energy throughout the day. She is interested in utilizing the psychotherapy situation to help her develop the skills to develop positive choices for improved sleep hygiene. Her response to the interventions in today's session were positive. She does appear motivated to be an active participant in treatment at this time.

(Administrative Record at 420.) For all of these reasons, the Court concludes that the ALJ's credibility determination is not supported by substantial evidence. *See Finch*, 547 F.3d at 935.

## C. Reversal or Remand

The scope of review of the Commissioner's final decision is set forth in 42 U.S.C. § 405(g) which provides in pertinent part:

> The court shall have the power to enter, upon the pleadings and transcript of the record, a judgment affirming, modifying, or reversing the decision of the Secretary, with our without remanding the cause for a rehearing.

42 U.S.C. § 405(g). The Eighth Circuit Court of Appeals has stated that:

> Where the total record is overwhelmingly in support of a finding of disability and the claimant has demonstrated his [or her] disability by medical evidence on the record as a whole, we find no need to remand.

*Gavin v. Heckler*, 811 F.2d 1195, 1201 (8th Cir. 1987); *see also Beeler v. Brown*, 833 F.2d 124, 127 (8th Cir. 1987) (finding reversal of denial of benefits was proper where "the total record overwhelmingly supports a finding of disability"); *Stephens v. Sec'y of Health, Educ., & Welfare*, 603 F.2d 36, 42 (8th Cir. 1979) (explaining that reversal of

---

[19] *Id.*

[20] *Id.* at 422-425.

denial of benefits is justified where no substantial evidence exists to support a finding that the claimant is not disabled). Here, the total record overwhelmingly supports a finding that Bailey is disabled because she is restricted from working more than 4 hours in a regular workday, and this restriction is supported by the medical evidence on the record as a whole. *See Gavin*, 811 F.2d at 1201.

## *VI. CONCLUSION*

The Court concludes that this matter should be reversed and remanded to the Commissioner for calculation of benefits. The medical opinions of Dr. Peterson, Bailey's treating physician, are entitled to controlling weight. Due to narcolepsy and other sleep disorders, Bailey is restricted by her treating physician from working more than 4 hours in a regular workday. Therefore, the Court finds that Bailey is entitled to disability benefits.

## *VII. ORDER*

For the foregoing reasons, it is hereby **ORDERED**:

This matter is **REVERSED** and **REMANDED** to the Commissioner of Social Security pursuant to sentence four of 42 U.S.C. § 405(g), to calculate and award benefits for Bailey.

DATED this __17th__ day of January, 2012.

JON STUART SCOLES
UNITED STATES MAGISTRATE JUDGE
NORTHERN DISTRICT OF IOWA